## THE CRIPPLE CREEK.
### No. 21/1941.

District Court, E. D. Pennsylvania, E. D.
Aug. 5, 1943.

Milton M. Borowsky and Freedman & Goldstein, all of Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw and Edwin Longcope, all of Philadelphia, Pa., for respondent.

GANEY, District Judge.

This is a libel on behalf of three seamen —the fourth seaman, Albert A. Stephany, having been granted a severance—Cecil H. Miller, a fireman, Priedo Rommell, boatswain, and James H. Williams, second cook and baker, all members of the Steamship "Cripple Creek" owned and operated by Lykes Steamship Company, for wages and damages due to wrongful discharge, for wrongfully retaining and converting all clothing, effects and seamen papers and for failure to make payment of wages to the end of the voyage under Sec. 4529 of the Revised Statutes, 46 U.S.C.A. § 596.

At the close of the libellants' case the respondent moved· to dismiss the libel alleging that the libellants had made out no cause of action. In order to expedite the matter, since obtaining the presence of seamen in court at the present time is exceedingly difficult, the motion was taken under advisement, and the respondent then offered its defense. It is the duty of the court to first dispose of the respondent's motion to dismiss and this is done by denying the same, for the reason that viewing the testimony in a light most favorable to the libellants, this court cannot say as a matter of law that the action should be dismissed. Accordingly, the matter is disposed of on the merits. With respect thereto the court makes the following:

### Findings of Fact

1. The libellants signed shipping articles at Galveston, Texas, for the Steamship "Cripple Creek", owned and operated by the respondent, before the United States

Shipping Commissioner on January 16, 1940, for a voyage to ports in Japan and China and such other ports in the world as the Master might direct and back to a port of final discharge in the United States for a term not to exceed twelve calendar months.

2. The Steamship "Cripple Creek" arrived at the Port of Honolulu, Hawaii, June 2, 1940, at or about 8 o'clock A. M. for the purpose of taking on fuel only.

3. Libellants were permitted to draw Five Dollars ($5) on their wages and to go ashore until 4:30 P. M. on that same day, pursuant to a sailing notice posted at the head of the gangway of the ship, showing the sailing time of the vessel to be 4:30 P. M. June 2, 1940.

4. Libellants saw the sailing notice, and left ship to go ashore and had not returned at 4:30 P. M., sailing time.

5. At 4:30 P. M. June 2, 1940, sailing time, the libellants not being aboard ship, the Captain instructed the Chief Mate to go ashore in search of the libellants, which he did, and returned at 5 P. M. without having been able to find them.

6. The Steamship "Cripple Creek" waited at the dock until 5:26 P. M., when it was forced to leave its berth in order to make room for another ship, and sailed out into the harbor.

7. The libellants arrived at the dock in a taxicab at about one hour after sailing time and observed the Steamship "Cripple Creek" out in the harbor.

8. An agent of the respondent was on the dock at the time of their arrival and volunteered to take libellants, as well as several other members of the crew, who had left the ship, and were on the dock at the time of their arrival, out to the vessel in a launch, to which they agreed and they arrived at the vessel in about one-half hour.

9. Arriving at the Steamship "Cripple Creek", a spokesman from the launch went aboard the Steamship "Cripple Creek" and advised the Captain that the men would come aboard if he did not prefer any charges against them, but the Captain would make no promise about logging them, and said further that the launch would have to be paid for. The spokesman returned to the launch, and after talk of arbitration, it left the side of the vessel and returned to port.

10. The reason that the libellants did not board the ship at the time they were along side of the vessel was that they felt they could compel the Captain to arbitrate the matter before the United States Shipping Commissioner in Honolulu, as they believed the vessel would sail shorthanded.

11. The libellants were absent from the vessel without leave.

12. The Steamship "Cripple Creek" remained at anchor until 5:11 A.M. June 3, 1940, waiting for the libellants to return to the vessel and upon their failure so to do, the vessel sailed for Philadelphia, via Panama Canal.

13. Upon arrival in the Panama Canal Zone the Captain of the Steamship "Cripple Creek" at the request of the libellants sent all the libellants' papers that could be found aboard the vessel to the libellants at Honolulu by air mail, deducting the postage therefor, from libellants' earned wages at their request.

14. On arrival at Philadelphia, the Captain turned over libellants' gear to the United States Shipping Commissioner, which was later returned to them.

15. The incidents surrounding the failure of the libellants to come aboard ship on June 2, 1940, at the Port of Honolulu was entered in the ship's log as of that date and within twenty-four hours of arrival at Philadelphia, the final port of discharge, the Master made an entry in the ship's log charging the libellants with desertion.

16. The vessel was fined for sailing shorthanded from Honolulu, which fine was later refunded to respondent.

17. Libellants' earned wages, including bonus and overtime less expense caused by their delaying the vessel, advances and taxes, were paid to them as soon as could possibly be done.

Conclusions of Law

1. The libellants were absent from the vessel under circumstances not amounting to desertion.

2. The respondent is not obliged to pay libellants wages to the end of the voyage, less expenses while ashore, passage money home, the return of the deductions made from their wages, punitive damages, or the two for one penalty in the United States Revised Statutes Sec. 4529, as all these items stem from the wrongful conduct of the libellants at the Port of Honolulu.

3. The Master by his conduct in leaving the dock one hour after sailing time, nor in the harbor while negotiating with the libellants, nor in sailing the following morning, did not breach the Articles of Employment with the libellants.

4. The Master in sailing from Honolulu without the libellants and with their gear and shipping papers on board was in no wise blameworthy, as this action was the fault of the libellants, by reason of their own conduct, and was only done after waiting for them more than twelve hours after sailing time.

5. There was no justification for the libellants' failure to board the ship and sailing in accordance with their articles, as the question of whether they were to be properly logged for their conduct was a matter to be disposed of by the United States Shipping Commissioner at the port of discharge and there was no justification in their attempt to delay the sailing of the vessel until they would compel arbitration of their alleged grievance by the Shipping Commissioner at the Port of Honolulu.

6. There was no abandonment of the libellants at Hawaii and whatever damage they suffered flows from their own improper conduct in failing to board the vessel.

7. The libellants' claims for wages and damages are not well founded.

### Opinion

To constitute the offense of desertion, 46 U.S.C.A. § 701, it is essential that there must be an intention not to return—animo non revertendi. Cloutman v. Tunison, C.C.Mass. 1833, Fed.Cas. No. 2,-907; Coffin v. Jenkins, C.C.Mass. 1844, Fed. Cas. No. 2,948. It seems to me from a careful examination of the record that it cannot be stated that these libellants deserted the vessel "Cripple Creek", in the sense that they intended to cut off completely all relationship with the vessel. However, I feel certain they were absent without leave, since I cannot conclude that any condition of returning was imposed on them by the Captain of the vessel. This, for the reason that the libellants could be logged by the Captain for their absence from the vessel, without their agreeing thereto, and it seems to me the real reason for their not boarding the vessel while it was in the harbor was, as one of the libellants stated, to compel the Captain to come ashore and have their alleged grievances arbitrated before the United States Shipping Commissioner at Honolulu.

While seamen should be afforded every protection with respect to their status by reason of the hazards of their calling and while the law has jealously surrounded them with every possible safeguard, it is not to be assumed that wrongful conduct on their part is in any wise to be condoned. It seems to me that here, everything that was possible to be done, was done by the Captain of the vessel, in order to have them comply with the Articles of Employment. They were admittedly late in arriving at the dock at sailing time, which was 4:30 P.M., which time they admitted they had knowledge of. This in itself is an extremely serious matter since the delay in sailing by a vessel might occasion great pecuniary loss to an owner, but notwithstanding this the Captain of the vessel waited one-half hour beyond sailing time for them to appear, and then not putting in an appearance, he went out of his way to dispatch the Chief Mate in an attempt to find them ashore, and he returned without any word of them. Even after his return the Captain waited another half hour for them until the vessel was forced to leave its berth by reason of another vessel having a right to dock and then about one hour beyond sailing time, the Captain sailed out into the harbor, where he anchored, still waiting their return. Upon their arrival at the dock more than an hour after sailing time an agent of the respondent volunteered to take them out to the vessel in a launch. This it again seems to me to be evidence of a real desire on the part of the respondent to do everything they could to have the libellants come aboard ship. Upon their arrival at the ship, there is a contradiction in the testimony about who went aboard the vessel and what the exact words were with respect to the conversation that ensued. However, I cannot persuade myself to the contention of the libellants that the condition, that they be logged, was imposed upon them by the Captain before they could board the ship. I believe that discussion was had concerning the possibility of their being logged, but, at least, the evidence does not show that they were refused permission to join the ship and as all of them knew the question of their being logged could be arbitrated before the United States Shipping Commissioner at their final port of discharge, Philadelphia,

if the Captain chose to log them, which he could do without their agreeing thereto. Accordingly, I feel it was their duty—having been admittedly late in arrival at the dock; having been given transportation by the respondent to the vessel in the harbor and not having been refused admission to the ship, the vessel waiting more than twelve hours for their going aboard—to join the ship and have their alleged grievances arbitrated at Philadelphia, the final port of discharge.

 It seems to me it would be a singularly odd rule of law, contended for by the libellants, which would permit them, though not actually deserters, but merely having the status of absent without leave, to be able to hold up the sailing of the ship, and to compel the Master to come back to port, and have their alleged grievances arbitrated by the Commissioner there, and upon his refusal so to do, they could be visited only with a two day deduction of wages and yet be able to claim wages to the end of the voyage.

All of the libellants' claims for damages stem from their election not to join the vessel and for this wrongful conduct on their part, respondent cannot be held liable. The earned wages of the libellants, while not paid to them for some time, were paid, it seems to me, as reasonably could be done, considering the circumstance of their whereabouts.

Accordingly, I hold that the conduct of the respondent was warranted under the circumstances and no liability should ensue to them as a result thereof. While there seems to be a paucity of authority on the point, reference is made to Johnson v. Blanchard, D.C., 7 F. 597; Brink v. Lyons, D.C., 18 F. 605, although decided before the Statute 46 U.S.C.A. § 701, and The Cadmus, Fed.Cas. No. 2,282.

Judgment is entered for the respondent.