123 So.2d 35 (1960)
Thomas S. CARSON, Appellant,
v.
GULF OIL CORPORATION, a foreign corporation, Appellee.
No. 1736.
District Court of Appeal of Florida. Second District.
September 2, 1960.
Rehearing Denied September 28, 1960.
*36 Margaret E. Deaton, Tampa, for appellant.
James O. Davis, Jr., Fowler, White, Gillen, Humkey & Trenam, Tampa, for appellee.
ALLEN, Chief Judge.
The appellant, as plaintiff in the lower court, filed a complaint against the appellee-defendant for back wages and other expenses which were incurred as a result of the alleged wrongful refusal of the defendant's ship captain to reinstate the plaintiff to his position as oiler aboard defendant's ship. The defendant answered admitting the former employment of defendant but alleged that a proper tender of all amounts due had been made by the defendant to the plaintiff. The defendant also set up the affirmative defense that plaintiff had left the ship without the permission of the master and therefore had forfeited any right to back wages. The case came on for jury trial and at the close of plaintiff's case, the lower court directed a verdict for the defendant and after the motion for new trial was denied, the court entered a final judgment on the verdict in favor of the defendant.
The plaintiff, Thomas S. Carson, was employed as oiler on the defendant's ship, "Gulf Trade." The ship was owned by defendant corporation and was engaged in transporting oil between Texas and Florida ports during the year 1958.
In October of 1958, while the ship was in Port Arthur, Texas, Carson received a notice from the Internal Revenue Department *37 ordering him to appear in Tampa on October 22, 1958, for a hearing in regard to his tax returns for 1955, 1956, and 1957. After leaving Port Arthur, the ship headed for Jacksonville, Florida, and two days prior to arrival Carson requested a leave of absence so that he could leave the ship in Jacksonville in order to appear in Tampa. He obtained approval from the Chief Engineer, his department head, and then he presented his request, along with the notice to appear, to the Captain, V. Alvarez. The Captain told Carson that he would prepare a written leave of absence which would be ready by the time the ship docked in Jacksonville.
The ship arrived in Jacksonville on Sunday evening, October 19, 1958. After completing his duties the following morning, Carson went to the Captain's quarters and was given his written leave of absence by the Captain, but since Carson's pay had not been computed, he asked Carson to come back to the ship later that day and told him the pay would be ready at that time. Carson said that would be alright and that he would come back later as his wife was to drive to Jacksonville and meet him that day and take him back to Tampa. (Seamen are paid when they leave the ship on a temporary or permanent leave).
Carson then took his leave of absence slip to the National Maritime Union Office and registered to re-ship out on the ship after its return from the next scheduled port Arthur, Texas, trip. The ship was to leave Jacksonville at 3:00 p.m. that day so Carson returned to the ship at 2:00 p.m. to pick up his pay and his discharge slip. The Captain informed Carson that he had not had a chance to compute the pay but he then directed the radioman to compute it. The Captain then retracted the permission for Carson to leave the ship because he had been unable to obtain a relief or replacement for him. Carson explained that he had to be in Tampa; that his leave of absence was not made contingent upon a replacement being found; that he had already registered with the Union to re-ship; and that he only desired his pay but was not quitting the job.
The Captain then refused to pay Carson unless he would return the leave of absence slip or consider himself to be quitting the job. The Chief Engineer, who had overheard the conversation, told the Captain that the storekeeper was qualified to fill in for Carson during Carson's absence. The Captain refused this suggestion and Carson then went to the Union office to see if they could help him get his pay. The ship left Jacksonville while Carson was gone.
Carson attended the hearing in Tampa and returned to Jacksonville within the week and applied to the Captain for reinstatement aboard the ship. The Captain told Carson that he had been permanently replaced and also refused to pay Carson the back wages.
After the suit was instituted Carson received a check on December 1, 1958, from the defendant corporation covering the back wages due. On the back of this check the following printed clause appears:
"This check is in payment of services and all other claims as set forth in attached statement. Payee's endorsement hereon constitutes acknowledgement of such payment."
Carson did not cash the check but did introduce it into evidence. The attached statement referred to in the above clause is a breakdown of deductions and pay.
The relevant portion of Title 46 U.S.C.A. § 596, pursuant to which this action was instituted provides:
"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; * * *. Every master or owner who refuses or neglects to make payment in the manner *38 hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts. * * *" (Emphasis supplied.)
Although raised for the first time on appeal, the appellee contends that the above quoted section is not applicable and that Title 46 U.S.C.A. § 544, which in part provides that the provisions of section 596 shall not apply to "vessels engaged in the coastwise trade," is applicable as a bar to the present action.
The first question to be decided is whether Carson was employed on a "vessel making coasting voyages," and therefore entitled to the penalties prescribed by the statute. In order to determine whether the instant case falls under coasting voyages or under the exemption of coastwise trade we must look to related decisions of the federal courts in an attempt to construe the act in a manner that will best effectuate its purpose. The word "voyage" may have different meanings under different circumstances, depending on the subject to which it relates or the context of the particular contract or statute in which the term is employed. La Bourgogne, 210 U.S. 95, 135, 28 S.Ct. 664, 52 L.Ed. 973. More specifically, 46 U.S.C.A. § 596 deals with voyages as differentiated from maritime activity confined to a harbor or port, or that does not require going to sea. Pacific Mail Steamship Co. v. Schmidt, 9 Cir., 214 F. 513; 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982. The word "voyage," as applied to vessels engaged in foreign and interstate commerce, within the meaning of the maritime law, has been held to be clearly inapplicable to a tug making short trips, generally not from port to port, but from one body of water to another, for the purpose of furnishing motive power to other vessels. Gardner v. The L.N. Danzler, D.C., 177 F. Supp. 736.
In Standard Dredging Co. v. Barnalla, 158 Va. 367, 163 S.E. 367, counsel for the parties had stipulated that at all times mentioned the tug in question was an enrolled vessel of the United States licensed to be employed in carrying on a coasting trade with New York as her home port. The court observed that although at the time the case arose the tug was employed in dredging operations in Hampton Roads, based on the stipulation of counsel and the fact that the tug was a large seagoing tug, the court concluded that the tug and its crew came within the protecting provisions of 46 U.S.C.A. § 596. It is noted in the Standard Dredging case that the stipulation designated the tug's activity as being coasting trade and the court relied on such designation as coming within the term "coasting voyages" as set forth in 46 U.S.C.A. § 596.
There apparently is little, if any, distinction drawn between the terms coasting voyages and coastwise voyages, but rather the distinction arises because of the type vessel employed and the maritime activity involved in the particular case. In regard to these terms the court in Mahar v. Gartland S.S. Co., Second Court of Appeals, 154 F.2d 621, 622, stated:
"The question, then, is whether the amendment of 1898 had any effect on the provisions of the amendatory act, now 46 U.S.C.A. § 544, as far as the `lake-going' trade is concerned. It seems quite clear that it did not. A country's `coast' ordinarily means those of its borders washed by the sea, and our shores on the Great Lakes do not come within this definition. It is obvious that Congress meant to distinguish between `coastwise' and `lake-going' trade; the distinction appears in the proviso to section 12 of the Act of 1872, and again in the amendatory *39 act of 1874. Appellant maintains that Congress intended to abandon this distinction when it used the word `coasting' in the 1898 amendment instead of `coastwise,' which was used in the previous enactments. However, none of the cases construing the Shipping Commissioners' Act appears to make any differentiation in the meaning of the two words, and we are not aware that any exists. Certainly it is highly doubtful that Congress would have chosen so equivocal and uncertain a way of eliminating the reiterated distinction between `coastwise' and `lake-going' trade." (Emphasis added.)
In the instant case the maritime activity involved must be designated a voyage whether "coasting" or "coastwise." John Riezinger, National Maritime Union Field Patrolman, testified that the "Gulf Trade" is a tanker normally engaged in voyages to Germany and coastwise trips. Carson signed on the "Gulf Trade" in Tampa and during his employment the vessel made at least one trip to Texas and returned through the Gulf of Mexico and the Atlantic Ocean to Jacksonville, Florida. It is a matter of common knowledge that the Gulf of Mexico, between the west coast of Florida and the Texas coast, is by no manner of speaking a sheltered body of water such as a harbor or coastal waterway. Webster's New International Dictionary, Second Edition, defines "coasting" as an "act or practice of sailing from port to port along a coast." Bouvier's Law Dictionary, Third Edition, defines voyage as "The passage of a ship upon the seas from one port to another, or to several ports * * * The actual transit of a vessel from port to port * * * Each trip constitutes a voyage * * *"
After a careful review of the related cases set forth herein, considered in relation to accepted definitions, we conclude that the Gulf Trade was engaged in a "coating voyage" during Carson's employment and therefore he is entitled to bring the instant action under 46 U.S.C.A. § 596.
The second question determinative of this appeal is whether the refusal of the defendant to pay Carson, when he left the ship in Jacksonville, was founded on "sufficient cause" as set forth in the statute. In Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 191, 74 L.Ed. 696, 698, the court stated:
"* * * The phrase `without sufficient cause' must be taken to embrace something more than valid defenses to the claim for wages. Otherwise, it would have added nothing to the statute. In determining what other causes are sufficient, the phrase is to be interpreted in the light of the evident purpose of the section to secure prompt payment of seamen's wages (H.R. Rep. 1657, Committee on the Merchant Marine and Fisheries, 55th Cong.2d Sess.) and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed.
"The words `refuses or neglects to make payment * * * without sufficient cause' connote, either conduct which is in some sense arbitrary or willful, or at least a failure not attributable to impossibility of payment. We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible."
A seaman brought an action for double wages in Prindes v. The S.S. African Pilgrim, Fourth Court of Appeals, 266 F.2d 125, 127, alleging that he left the ship with permission, but was late in returning aboard and that replacement for him had not been obtained. The seaman had left the ship on January 28 with leave and as of that time no sailing time had been posted but the officer on deck told him that the ship *40 would probably not sail until the following day. A provision in the union agreement then in force required the ship's sailing time to be posted eight hours before the scheduled sailing.
A sailing time of 9:00 p.m. was posted after the seaman had gone ashore. The seaman returned to the ship at 9:00 p.m. and it sailed one hour later. The ship's master logged the seaman two day's pay on the basis that he had not been aboard at least one hour before the posted sailing time as authorized by the union agreement. The seaman thereafter refused to accept his pay minus the two days logged pay and refused to sign the wage voucher on the ground that it called for a mutual release of all claims. In regard to the seaman's action for double wages the court stated:
"Even if the logging penalty were proper, Prindes is entitled to liquidated damages for withholding of the undisputed part of his wages (total wages minus logged pay) until he would sign a release. It is well settled that a seaman is entitled to double wages or `waiting time' under 46 U.S.C.A. § 596, if wages concededly due are tendered only upon condition that he will release disputed claims. Mandelin v. Kenneally, 4 Cir., 1926, 11 F.2d 344 is almost identical to the case at bar. There, the master had fined several seamen for dereliction of duty and misconduct and deducted the fines from their total wages due, and refused to pay the reduced amounts unless the seamen would agree to accept such net sums in full settlement. The seamen refused. This Court held that, even though the fines were proper, the master could not impose the condition. In allowing the double wage penalty, it was said:
"`Assignments 4 and 5 present the question of the right of the respondent to withhold the amounts admittedly due libelants at the end of their voyage on the 15th of November, 1924, at Newport News, Va., unless libelants would accept the same upon the conditions imposed by respondent. This the respondent could not do, as it constituted neither a payment of the wages nor a lawful tender of the amount due, but, on the contrary, a proffer, of a future lawsuit respecting the same. The fact that, in the litigation that followed in this particular case, the court sustained respondent's claims to withhold the fines and penalties imposed, would not warrant the imposition of any such condition or penalty as was sought to be imposed. The only effect of libelants' accepting the payment of the wages upon the conditions prescribed would have been to surrender their claims entirely.'
"This proposition is reiterated in The Lake Gaither, 4 Cir., 1930, 40 F.2d 31, where, when the seaman declared his purpose to sue the shipping company for alleged injuries, the master refused to pay the seaman's wages unless he would sign a receipt acknowledging that he had not contracted any illness or been injured during the voyage; and in Forster v. Oro Navigation Company, D.C.D.S.N.Y. 1954, 128 F. Supp. 113, where tender of payment was conditioned upon the seaman signing off the ship `by mutual consent.' See also The Corapeak, 4 Cir., 1931, 46 F.2d 262."
* * * * * *
"The purpose of the statute is to shield seamen against pressure to release claims, even ill-supported claims, by withholding from them sums as to which their right is not in dispute. The shipowner argues that Prindes could have signed the release and protected his claim for the logged pay by adding the words `under protest' to the release. However, there is no showing that Prindes was offered this alternative, and there is no indication that it *41 would have been acceptable to the paymaster."
The defendant in the instant case plead in its answer that "by reason and virtue of the Plaintiff wrongfully leaving the vessel, the S.S. `Gulf Trade,' that said Plaintiff has forfeited any and all rights to wages due him for employment aboard said vessel and that said departure from said vessel was without the permission of the Master."
It is conceded by the appellee that the burden of proving "sufficient cause" under section 596 is upon the employer but appellee contends that the plaintiff, by his own testimony and evidence established the defenses that were pleaded by the defendant. The defendant, as quoted above, contends that the plaintiff forfeited any and all rights to wages by leaving the vessel. This defense has as its origin 46 U.S.C.A. § 701 under the first clause which provides for the forfeiture of all wages for desertion. Within the purview of this act desertion consists in the abandonment of duty by quitting the ship before the termination of his engagement, without justification and with the intention of not returning. The Cripple Creek, D.C.Pa. 1943, 52 F. Supp. 710.
In the instant case Carson was given a written leave of absence which contained no provision that it was conditioned upon a replacement being obtained. After docking at Jacksonville the captain suggested that Carson take care of his affairs in town and come back by the ship and pick up his pay. Carson immediately went to the union office and filed to re-ship on the "Gulf Trade" on its next trip thus manifesting an intent to only temporarily be absent from the ship. Upon returning to the ship Carson was asked to return the written leave of absence and he refused in view of his commitment to appear in Tampa and his arrangements with the union to re-ship on the next trip.
In passing on the defendant's motion for a directed verdict at the close of the plaintiff's case, the court is to construe the testimony and all proper inferences therefrom most favorable to the plaintiff. Kilgore Seed Co. v. Pearce, Fla. 1958, 103 So.2d 112. Moreover, the party moving for a directed verdict admits, for purposes of the motion, not only the facts adduced but every conclusion favorable to his adversary that may be fairly and reasonably inferred therefrom, and it is only when the evidence, viewed in that light, is found to be legally insufficient to support a verdict for the party moved against that the entry of a directed verdict is proper. Le Fante v. Miami Air Conditioning Co., Fla.App. 1959, 111 So.2d 725.
We conclude therefore that it was error for the lower court to direct the verdict for the defendant and the case must be reversed for a new trial on the issues presented.
Reversed.
KANNER, J., and SAULS, RICHARD, Associate Judge, concur.