### AMERICAN SAVINGS AND LOAN OF FLORIDA, Plaintiff,

v.

### PEMBROKE LAKES REGIONAL CENTER ASSOCIATES, LIMITED, and CF–Pembroke Associates, Defendants.

#### No. 87–0991–CIV.

United States District Court,
S.D. Florida.

April 11, 1989.

William Berger and Thomas A. Conrad, Miami, Fla., for CF–Pembroke.

Richard L. Lapidus, Miami, Fla., for Pembroke Lakes Regional Center Associates, Ltd.

## MEMORANDUM OPINION

## ORDER GRANTING MOTION FOR DIRECTED VERDICT

SPELLMAN, District Judge.

THIS CAUSE comes before this Court after a jury trial held on April 3, 4, 5, 6 and 10, 1989. At the close of the evidence, both parties made a motion for a directed verdict. This Court hereby grants directed verdict for PEMBROKE LAKES REGIONAL CENTER ASSOCIATES, LIMITED on all claims.

## BACKGROUND

This action between PEMBROKE LAKES REGIONAL CENTER ASSOCI-ATES, LIMITED, ("PEMBROKE LAKES") and CF–PEMBROKE ASSOCIATES ("CF–PEMBROKE"), is a derivative action from a suit filed in interpleader by AMERICAN SAVINGS AND LOAN OF FLORIDA ("ASL") as the holder of an escrow fund. On June 13, 1985, PEMBROKE LAKES and CF–PEMBROKE entered into a contract for the sale of real property. Two million dollars was placed in escrow with ASL as a deposit by CF–PEMBROKE. In essence, the land sale contract provided that if PEMBROKE LAKES failed to satisfy all pre-closing conditions, CF–PEMBROKE could get its deposit back, but that if CF–PEMBROKE failed to go through with the contract, it did so at the expense of forfeiting that deposit to PEMBROKE LAKES.

CF–PEMBROKE wrote two letters to PEMBROKE LAKES; one on August 27, 1986, and one on January 12, 1987, demanding return of the deposit pursuant to Paragraph Twelfth of the Agreement of Sale and alleging that PEMBROKE LAKES had failed to comply with the pre-closing conditions to the contract. A copy of the August 27, 1986 letter was contemporaneously sent to ASL. ASL, in turn, brought the original action in interpleader asking that the Court determine which of the defendants (PEMBROKE LAKES or CF–PEMBROKE) is in fact entitled to the money. ASL was subsequently discharged from the action.

Jurisdiction is based upon diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332. CF–PEMBROKE removed this case from state court.

## CLAIMS OF THE PARTIES

First, CF–PEMBROKE claims that PEMBROKE LAKES REGIONAL CENTER ASSOCIATES, LTD. was required to obtain site plan approval leading to the issuance of building permits and that PEMBROKE LAKES breached the Agreement for Sale and Purchase by establishing a closing date and by attempting to conduct a closing prior to obtaining such site plan approval.

Second, CF–PEMBROKE further contends that if it was CF–PEMBROKE's responsibility to furnish the site plan, and it was PEMBROKE LAKES's responsibility to seek the approval of that site plan, that PEMBROKE LAKES failed under the contract to notify CF–PEMBROKE so that such a site plan could be furnished and approval thereafter obtained; and that PEMBROKE LAKES therefore breached the contract.

PEMBROKE LAKES claims that it fulfilled all of the conditions of closing and special closing conditions provided for in the Agreement for Sale and Purchase and that CF–PEMBROKE breached that contract by refusing to close on the date set. PEMBROKE LAKES contends that it was never required under the contract to obtain site plan approval for building permit purposes.

Lastly, CF–PEMBROKE claims that if the Agreement for Sale and Purchase did not require that PEMBROKE LAKES obtain site plan approval leading to the issuance of building permits, CF–PEMBROKE was operating under a mistake which went to the substance of the agreement and was not the result of lack of due care on its part. CF–PEMBROKE contends that there was therefore a unilateral or mutual mistake in the making of the contract and that CF–PEMBROKE is entitled to rescission of the contract.

THE EVIDENCE

The evidence, taken in the light most favorable to the nonmoving party, CF–PEMBROKE, reveals the following:

In May or June of 1984, Cadillac Fairview Shopping Centers (US), Ltd. and PEMBROKE LAKES signed a Letter of Intent to enter into a Joint Venture with respect to a 247.047 acre parcel of land in Broward County, Florida. The Joint Venture was for the purpose of developing a regional shopping center and developing residual lands for residential and commercial purposes. The Letter of Intent provided that it was not to be binding upon the parties until a final agreement was reached. The arrangement was cancelable at the will of either party. No final agreement was reached.

In October of 1984, PEMBROKE LAKES notified Cadillac Fairview that it did not wish to go forward with the Joint Venture.

On June 13, 1985, the parties signed a Contract of Purchase and Sale ("the Agreement") by which CF–PEMBROKE agreed to purchase 95 acres of the site which was the subject of the Letter of Intent for use as a multi-tenant enclosed mall regional shopping center. The contract obligated PEMBROKE LAKES to obtain certain government approvals. Pursuant to the Agreement of Sale, CF–PEMBROKE paid $2,000,000 as a contract deposit to ASL as escrow agent, to be held in accordance with the provisions of the Agreement.

CF–PEMBROKE is a New York general partnership that was created specifically in connection with the subject transaction. It is one of a number of "Cadillac Fairview" entities.

PEMBROKE LAKES is a Florida limited partnership that was created specifically in connection with the subject transaction.

On July 15, 1986, PEMBROKE LAKES notified CF–PEMBROKE that all special closing conditions had been met pursuant to the agreement of June 13, 1985, and set a closing for August 15, 1986.

On August 1, 1986, CF–PEMBROKE notified PEMBROKE LAKES that it did not believe that PEMBROKE LAKES had satisfied the Special Closing Conditions of the Agreement of June 13, 1985.

On August 19, 1986, the parties and their lawyers met at the offices of Broad and Cassel to attempt to resolve the matter. The attempt was unsuccessful.

On August 22, 1986, CF–PEMBROKE was tendered a deed.

On August 27, 1986, CF–PEMBROKE wrote to PEMBROKE LAKES canceling the agreement and demanding the return of its deposit.

On January 12, 1987, CF–PEMBROKE again wrote a letter to PEMBROKE LAKES canceling the agreement and demanding return of its deposit.

PEMBROKE LAKES was obligated to perform all of the special conditions set out in Paragraph Fifth and Twelfth of the Agreement of June 13, 1985. Those special conditions obligated PEMBROKE LAKES to obtain conceptual site plan approval as a condition precedent to closing, but not to obtain site plan approval so as to permit the filing of an application for building permits.

The Plan (#HHHH), as defined in the Agreement (#U), has been approved by all governmental authorities having jurisdiction and PEMBROKE LAKES has satisfied all special conditions as set forth in Paragraph Fifth and Twelfth of the Agreement of June 13, 1985.

The original joint venture concept between the parties did not carry over to the subsequent Agreement of Sale and Purchase.

CF–PEMBROKE is in default under the Agreement for refusing to purchase the premises on the purported closing date.

## CONCLUSIONS OF LAW

There are three issues, as detailed above, which were litigated before this Court. This Court finds that there is no material issue as to any fact, and that a directed verdict should be rendered in favor of PEMBROKE LAKES as a matter of law.

The Court may remove the case from the jury by directing a verdict in favor of one party or the other, where the evidence is legally insufficient to support a verdict for the party against whom the verdict is directed. *Dial v. Yell*, 432 So.2d 75, 75 (Fla. 4th DCA 1983). The evidence must be taken in the light most favorable to the nonmoving party. *Carson v. Gulf Oil*, 123 So.2d 35, 41 (Fla. 2d DCA 1960). In this case, taking the evidence in the light most favorable to CF–PEMBROKE, the evidence is legally insufficient to support a verdict for CF–PEMBROKE, and this Court must direct a verdict for PEMBROKE LAKES.

a. Site Plan Approval

The first issue to be addressed is whether PEMBROKE LAKES was required, under the provisions of the Agreement, to obtain site plan approval leading to the issuance of building permits by the City of Pembroke Lakes. This issue first came before this Court on the filing of PEMBROKE LAKES's Motion for Summary Judgment and CF–PEMBROKE's Cross Motion for Summary Judgment.

The Motions for Summary Judgment revolved around whether PEMBROKE LAKES was obligated under the Agreement, specifically Paragraph Twelfth, paragraph B, to obtain site plan approval leading to the issuance of building permits as a condition precedent to closing. This Court examined the Agreement and found, *under the record as it existed at that time*, that the Agreement was ambiguous. The construction of an ambiguous contract is a matter of fact for the jury, and this Court accordingly denied both motions for summary judgment. *Industries, Investments & Agencies (Bahamas) Ltd. v. Panelfab International Corporation*, 529 F.2d 1203, 1211 (5th Cir.1976).[1]

The evidence that this Court relied upon in ruling that this Agreement was ambiguous was two-fold. First, the affidavit of Kenneth Kraus, an attorney for CF–PEMBROKE who participated in negotiating the terms of the Agreement, stated that PEMBROKE LAKES assured CF–PEMBROKE that PEMBROKE LAKES would obtain all approvals necessary for the development of the regional shopping center so as to permit the filing of an application for building permits. Second, CF–PEMBROKE asserted that the original joint venture concept between the parties carried over to the subsequent Agreement of Sale and Purchase. Neither of these contentions were proved at trial. Therefore, while this Court correctly denied the motions for summary judgment, the evidence at trial is legally insufficient to support either of these contentions.

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Kenneth Kraus, at trial, stated that although it was his understanding that PEMBROKE LAKES was obligated to obtain the site plan approval, there were no discussions about who was to obtain the site plan approval for building permit purposes. Further, Mr, Kraus testified that the Plan referred to in the Agreement was the conceptual site plan which was attached to that Agreement. That conceptual site plan was the only plan referenced in the Agreement. Mr. Kraus testified that he knew that the conceptual site plan could not have been used to obtain site plan approval for building permit purposes. Indeed, each of CF–PEMBROKE's own witnesses acknowledged that the conceptual site plan, the Plan as defined by the Agreement itself, could not have been used to obtain site plan approval.

David Schwartz, the Cadillac Fairview Senior Vice President that negotiated the purchase of the land for CF–PEMBROKE, testified that he particularly liked the use of the conceptual site plan, because it did not obligate CF–PEMBROKE to decide where to place the buildings. This was particularly important in that CF–PEMBROKE did not have, and never obtained, the first anchor tenant. While it is not impossible to develop the type of detailed site plan required for site plan approval leading to the issuance of building permits without an anchor tenant, it is much more usual to have at least one or more anchor tenants to design the shopping center around. Anchor tenants have great control in the size, elevation and design of their own buildings. Therefore, if site plan approval is obtained without having an anchor tenant, it is likely that the builder will have to seek new approval with a modified site plan once the anchor tenants are obtained.

Further, nowhere in the Agreement contract does it state that PEMBROKE LAKES would obtain all the approvals necessary for the development of a regional shopping center so as to permit the filing of an application for building permits. The Agreement went through ten separate drafts, over a five month period. Although the first draft was prepared by PEM-

BROKE LAKES's attorney, the Agreement, as executed, was a fully negotiated instrument. Additionally, although the original joint venture agreement contained language that specifically obligated PEMBROKE LAKES to obtain site plan approval necessary for the development of a regional shopping center so as to permit the filing of an application for building permits, that language was never included in the Agreement for Sale and Purchase. One draft did obligate the seller, PEMBROKE LAKES, to obtain the building permits, but was deleted because PEMBROKE LAKES did not want to be dependent on the submission of detailed plans from CF–PEMBROKE. PEMBROKE LAKES would have been dependent on the submission of detailed plans from CF–PEMBROKE in obtaining any site plan approval that would lead to the filing of an application for building permits. There was absolutely no evidence that there was any agreement to carry over the original joint venture concept to the Agreement of Sale and Purchase.

The evidence before this Court conclusively establishes that the only plan referred to in the Agreement was the conceptual site plan. That plan was defined in the Agreement itself, and was attached as an exhibit to the Agreement. Paragraph Twelfth reads as follows:

TWELFTH *Special Closing Conditions*

A. There has heretofore been prepared by Seller a master plan entitled "Conceptual Site Plan Pembroke Lakes Regional Center", dated May 24, 1985 and prepared by Gee and Jenson for the Land and the peripheral area (a total of approximately 217.5 acres) which plan includes the use of not less than 95 acres for the development of a multi-tenant enclosed mall regional shopping center (including the Ring Road) and other commercial uses containing not less than 1,600,000 square feet of gross leasable area, together with supporting parking areas (including parking garages) of 5 parking spaces for each 1,000 square feet of gross leasable area, (i.e., space

leasable to tenants and not including common areas such as, but not including, the enclosed mall and the parking areas) and which plan includes the use of the Outparcel for commercial purposes, which plan has been approved by Seller and Purchaser. The plan and the criteria set forth in this paragraph A are collectively referred to as the "Plan".

B. Seller agrees that it shall diligently and continuously, using reasonable efforts, at its own cost and expense, take all action necessary to (i) obtain approval of the Plan by all governmental authorities having jurisdiction, (ii) obtain all rezoning and zoning variances which may be necessary to permit development of the Premises as a regional shopping center in accordance with the Plan and the use of the Outparcel for commercial purposes, (iii) prepare, file and obtain approval of any and all required environmental statements and reports necessary to permit development of the Premises as a regional shopping center and Outparcel in accordance with the Plan and (iv) obtain any subdivision plat approval necessary to permit development of the Premises as a regional shopping center and Outparcel in accordance with the Plan and record the same. For the purposes of this Agreement, the issuance of all approvals (the "Approvals") referred to in clauses (i), (ii), (iii) and (iv) of this Paragraph B are herein referred to as the "Special Closing Conditions".

. . . .

■ This Plan, as defined in the Agreement, is the only plan that the parties intended to be used to get approval from all governmental agencies having jurisdiction. Therefore, the next question is whether or not PEMBROKE LAKES obtained approval for that plan by all governmental agencies having jurisdiction. CF–PEMBROKE argues that because there was no formal process by which the conceptual site plan, standing alone, could be formally approved, PEMBROKE LAKES failed to obtain the necessary approvals. PEMBROKE LAKES contends that the approvals were all obtained, albeit as part and parcel of the Development of Regional Impact ("DRI")

and other approvals. Mr. Scott, the city planner of Pembroke Pines, testified that he was unsure whether the city commission had approved the conceptual site plan in any formal manner, but that the conceptual site plan had been approved as part of the DRI. Mr. Scott testified that while the conceptual site plan was not sufficient to gain site plan approval leading to the issuance of building permits, it was sufficient for DRI approval and that the conceptual site plan was reviewed by agencies in the City of Pembroke Pines. Mr. Hampton, the city manager of Pembroke Pines and Mr. Scott's superior, testified that the conceptual site plan had been approved by the city commission. Contained in Pembroke Lakes' Exhibit #DDDD are the Ordinances of the City of Pembroke Pines, specifically approving the same. Therefore, the conceptual site plan was approved by all governmental agencies having jurisdiction, and PEMBROKE LAKES satisfied all of the special closing conditions of the Agreement.

Because this Court has ruled that PEMBROKE LAKES did not have the obligation, under the Agreement, to obtain site plan approval which was sufficient to lead to the issuance of building permits, this Court does not have to reach the issue of whether CF–PEMBROKE is estopped from claiming breach of the contract because CF–PEMBROKE never supplied PEMBROKE LAKES with a site plan capable of being approved by the City.

b. Mutual or Unilateral Mistake

CF–PEMBROKE claims that if the Agreement for Sale and Purchase did not require that PEMBROKE LAKES obtain site plan approval leading to the issuance of building permits, CF–PEMBROKE was operating under a mistake which went to the substance of the agreement and was not the result of lack of due care on its part. CF–PEMBROKE contends that there was therefore a unilateral or mutual mistake in the making of the contract and that CF–PEMBROKE is entitled to rescission of the contract.

██ As discussed before, all of the witnesses for CF–PEMBROKE acknowledged that they were aware that the conceptual site plan could not be used to obtain site plan approval leading to the issuance of building permits. They also testified that the Plan, as defined in the Agreement, referred to the conceptual site plan. Therefore, there could only be a claim of mutual or unilateral mistake if there was some other evidence to support CF–PEMBROKE's contention that PEMBROKE LAKES was to obtain site plan approval leading to the issuance of building permits. Such evidence was not presented.

First, there was no evidence that the joint venture concept was carried over to the Agreement of Sale and Purchase. The purposes of the two concepts were completely different. The purpose of the joint venture concept was to jointly develop a regional shopping center. To that end, PEMBROKE LAKES, as a partner of CF–PEMBROKE, would have been responsible for obtaining site approval for building permits purposes. The concept of the Agreement of Sale and Purchase was the sale of land, to be used to develop a regional shopping center. PEMBROKE LAKES was not a partner of CF–PEMBROKE, and would not be involved in any phase of the development of the shopping center itself. There is a clear deviation of purposes between the two concepts, and no evidence to establish that CF–PEMBROKE could reasonably have believed that PEMBROKE LAKES would have retained the same kinds of responsibilities under the Agreement for Sale and Purchase as it had under the joint venture letter of intent.

Second, all of the witnesses acknowledged that they understood that the conceptual site plan could not have been used to obtain site plan approval leading to the issuance of building permits. Yet, the conceptual site plan is the only plan defined in the Agreement, and is attached as an exhibit to the Agreement. Further, the witnesses testified that they understood that the approvals to be obtained were to be obtained for that particular site plan—the conceptual site plan. Although CF–PEMBROKE argued, and presented testimony,

that they believed that if that conceptual site plan was not sufficient for PEMBROKE LAKES's purposes, PEMBROKE LAKES could simply ask for more details, the fact remains that the witnesses all knew, at the outset, that the conceptual site plan could not be used for site plan approval, and there is no evidence that the purpose of that conceptual site plan was to obtain site plan approval leading to the filing of an application for building permits. The evidence suggests the exact opposite.

██ This was a negotiated contract. There were ten drafts of the Agreement, over a five month period, negotiated by extremely sophisticated lawyers and businessmen. CF–PEMBROKE had its own architects, engineers and attorneys overseeing the project. This Court cannot imply a provision in this contract that clearly was not present in the contract itself. *International Expositions, Inc. v. City of Miami Beach*, 274 So.2d 29, 30–31 (Fla. 3d DCA 1973); *Jacobs v. Petrino*, 351 So.2d 1036, 1039 (Fla. 4th DCA 1976). Here, there is no evidence that CF–PEMBROKE could reasonably have relied on any provision of the contract, or on any assurance by PEMBROKE LAKES that PEMBROKE LAKES would obtain site approval which would lead to the filing of an application for building permits.

Accordingly, it is hereby

ORDERED AND ADJUDGED that PEMBROKE LAKES's Motion for a Directed Verdict on all claims is GRANTED. This Court finds that PEMBROKE LAKES satisfied all conditions precedent for the closing, pursuant to the valid Agreement entered into by the parties, and that CF–PEMBROKE breached that Agreement by failing to close on August 15, 1986. PEMBROKE LAKES is hereby directed to submit a proposed final judgment to this Court within ten (10) days of the date of this Order.

DONE AND ORDERED.